1

2

3

4

5

6

7

8               **UNITED STATES DISTRICT COURT**

9               **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   MEDIFAST, INC.; BRADLEY                     CASE NO. 10-CV-382 JLS (BGS)
     MACDONALD,
12                                               **ORDER: (1) GRANTING IN PART
                              Plaintiffs,        AND DENYING IN PART
13                                               DEFENDANT ROBERT L.
                                                 FITZPATRICK'S MOTION TO
14          vs.                                  STRIKE; (2) GRANTING COENEN
                                                 DEFENDANTS' MOTION TO
15                                               STRIKE; (3) GRANTING
                                                 MINKOW DEFENDANTS'
16                                               MOTION TO STRIKE;
                                                 (4) DENYING AS MOOT
17   BARRY MINKOW; FRAUD DISCOVERY               MINKOW DEFENDANTS'
     INSTITUTE, INC.; ROBERT L.                  MOTION TO DISMISS
18   FITZPATRICK; TRACY COENEN;
     SEQUENCE, INC.; WILLIAM LOBDELL;            (Doc. Nos. 43, 88, 97, 98)
19   IBUSINESS REPORTING;
     ZEEYOURSELF,
20
                              Defendants.
21

22
            Presently before the Court are three motions to strike Plaintiffs' complaint under California's
23
     anti-SLAPP statute, California Code of Civil Procedure section 425.16.[1] (Doc. Nos. 88, 97, 98.) Also
24
     before the Court are Plaintiffs' opposition (Doc. No. 105 (Opp'n)) and Defendants' respective replies.
25
     (Doc. Nos. 123 (FitzPatrick Reply), 124 (Coenen Reply), 125 (Minkow Reply)).  Having considered
26
     the parties' arguments and the law, the Court **GRANTS** Defendants Coenen and Sequence, Inc.'s
27

28
     _____

            [1]  Unless otherwise noted, all subsequent statutory references are to the California Code.

(collectively, Coenen's) motion; **GRANTS** Defendants Minkow, Fraud Discovery Institute, Inc. (FDI), William Lobdell, and iBusiness Reporting's (collectively, Minkow's) motion; and **GRANTS IN PART** and **DENIES IN PART** Defendant FitzPatrick's motion.

## BACKGROUND

Plaintiff Medifast, Inc. is a publicly traded Delaware corporation with its principal place of business in Maryland.  (Doc. No. 6 (FAC) ¶ 6.)  Medifast produces, distributes, and sells "weight management and health management consumable products" under a variety of brand names, including Take Shape for Life (TSFL).  (*Id.* ¶ 18.)

TSFL, a wholly owned subsidiary of Medifast, is a weight loss program and "integrated support system that helps people make the necessary changes in their lifestyles to create optimal health."  (*Id.* ¶ 21.)  TSFL combines the Medifast product line "with the support of health coaches and certified health advisors."  (*Id.*)  Medifast customers interested in becoming TSFL clients may do so by contacting a health coach through the Medifast website.  (*Id.* ¶ 24.)  Often, TSFL clients are referred to the program by other TSFL clients or health coaches.  (*Id.* ¶ 25.)

Beyond a weight-loss program, TSFL "offers its clients an opportunity to increase their income if they choose to become a TSFL health coach."  (*Id.* ¶ 26.)  A TSFL client can become a health coach by purchasing "either the Application Pak or Career Builder Pak for a one-time cost of $199," executing an application, and passing a test.  (*Id.* ¶¶ 26, 28.)  Once certified, health coaches can sell Medifast products to others and recruit health coaches to join their teams.  (*Id.* ¶ 29.)  Health coaches are not required to purchase Medifast products with their own funds or hold inventory—all orders are shipped directly from Medifast to the end-user.  (*Id.* ¶ 27.)

Health coaches earn commissions based on the amount of Medifast products they sell to other health coaches, non-TSFL clients, and their clients.  (*Id.* ¶ 32.)  Health coaches who recruit other health coaches to join their teams also earn residual commissions on sales of Medifast product by their recruits.  (*Id.*)

Plaintiffs Medifast and Bradley MacDonald[2] (collectively, Plaintiffs) allege that Defendants

---

[2]   MacDonald is the executive chairman of Medifast's board of directors, a Medifast shareholder, and the co-founder of TSFL.  (FAC ¶ 7.)

engaged in a series of coordinated attacks on Medifast and the TSFL program designed to increase the value of a short position[3] Defendants held in Medifast stock. (*See id.* ¶ 40–45.)  According to Plaintiffs, Defendants disseminated online press releases, reports, memoranda, videos, and other documents making defamatory statements regarding Medifast and the TSFL program.  (*See* FAC ¶¶ 46–96.)  For example, Defendants allegedly stated that TSFL "operates as an endless chain or pyramid scheme" (*id.* ¶ 49.A); that "Medifast's reporting to its shareholders is false and misleading" (*id.* ¶ 49.B); that "Medifast is similar to Bernie Madoff's massive Ponzi scheme" (*id.* ¶ 50.B); that Medifast "is in violation of the laws of California and New York, as well as Federal securities laws (*id.* ¶ 55); that Medifast's outside auditor "was 'moonlighting as the company's stock promoter'" (*id.* ¶ 60); that "Medifast is merely a pump-and-dump scheme" (*id.* ¶ 69.C); that "Medifast is in violation of Federal Trade Commission regulations" (*id.* ¶ 79.A); and that "Medifast Executives are guilty of insider trading" (*id.* ¶ 79.C).  According to Plaintiffs, Medifast's stock lost 45% of its value during the period of Defendants' attacks.  (*Id.* ¶ 81.)

On February 17, 2010, Plaintiffs filed this action accusing Defendants of defamation, violation of Corporations Code section 25400, and violation of Business and Professions Code section 17200. (Doc. No. 1.)  On February 19, 2010, Defendants allegedly "relaunched the attack on Medifast" and accused Plaintiffs "of 'using threat and intimidation designed solely to silence anyone from speaking critically about their business model.'"  (FAC ¶ 83; *see id.* ¶ 86.)  On April 12, 2010, Plaintiffs amended their complaint to add a claim for civil conspiracy to defame and allegations regarding Defendants' "post-filing attack."  (FAC ¶¶83–88, 106–112.)

After Plaintiffs filed their FAC, Defendants moved to strike Plaintiff's complaint under California's anti-SLAPP statute.  (Doc. Nos. 12, 19, 44.)  On May 6, 2010,  the Court granted Plaintiffs' motion to continue the briefing schedule and granted the parties ninety days in which to conduct discovery on four limited issues.  (Doc. No. 46, at 9.)  The Court further denied Defendants' motions to strike without prejudice and directed Defendants to refile their motions to strike after the

---

[3]  A short position "[o]ccurs when a person sells stocks he or she does not yet own.  Shares must be borrowed, before the sale, to make 'good delivery' to the buyer.  Eventually, the shares must be bought back to close out the transaction.  This technique is used when an investor believes that the stock price will drop."  Financial Glossary, YAHOO! FINANCE, http://biz.yahoo.com/f/g/ss.html (last visited Mar. 1, 2011).

close of the limited discovery period. (*Id.*) Following two extensions of the limited discovery period (Doc. Nos. 63, 83), Defendants refiled the instant motions to strike on November 9 and November 19, 2010. (Doc. Nos. 88, 97, 98.)

## LEGAL STANDARD

Civil Procedure Code section 425.16 allows a defendant to gain early dismissal of causes of action aimed at chilling the valid exercise of the constitutional rights of freedom of speech and petition for redress of grievances. Cal. Civ. Proc. 425.16(a); *Varian Med. Sys., Inc. v. Delfino*, 106 P.3d 958, 966 (Cal. 2005). These meritless suits often are referred to as "strategic lawsuits against public participation" or "SLAPP" suits; hence section 425.16 is often referred to as the "anti-SLAPP statute." *See Balzaga v. Fox News Network, LLC*, 93 Cal. Rptr. 3d 782, 786 n.3 (Cal. Ct. App. 2009).

"A court considering a motion to strike under the anti-SLAPP statue must engage in a two-part inquiry." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1110 (9th Cir. 2003). First, the defendant must make an initial prima facie showing "that the challenged cause of action is one arising from protected activity." *Navellier v. Sletten*, 52 P.3d 703, 708 (Cal. 2002). "A defendant meets this burden by demonstrating that the act underlying the plaintiff's cause fits one of the categories spelled out in section 425.15, subdivision (e)." *Id.* (quoting *Braun v. Chronicle Publ'g Co.*, 61 Cal. Rptr. 2d 58, 61 (Cal. Ct. App. 1997)) (internal quotation marks omitted).

Second, once the defendant has made a prima facie showing, the court "must then determine whether the plaintiff has demonstrated a probability of prevailing on the claim." *Id.* A plaintiff has a probability of prevailing if "the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." *Wilson v. Partker, Covert & Chidester*, 50 P.3d 733, 739 (Cal. 2002) (quoting *Matson v. Dvorak*, 46 Cal. Rptr. 2d 880, 886 (Cal. Ct. App. 1995)) (internal quotation marks omitted). "The plaintiff's showing of facts must consist of evidence that would be admissible at trial." *Hall v. Time Warner, Inc.*, 63 Cal. Rptr. 3d 798, 804 (Cal. Ct. App. 2007).

Only when a defendant shows that a claim is based on protected conduct and the plaintiff fails to show a likelihood of success on that claim is it subject to dismissal. *Varian Med. Sys.*, 106 P.3d at 966.

**ANALYSIS**

Three groups of Defendants have filed motions to strike Plaintiffs' complaint under the anti-SLAPP statute.  Plaintiffs concede that section 425.16(e)(3), which protects "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest," applies to Defendants' statements.  (Opp'n 22.)  Thus, the only question before the Court is "whether Plaintiffs have met their burden in establishing a probability of prevailing on their claims."  (*Id.*)

**1.      Libel Per Se**

Plaintiff's first claim alleges libel per se.[4]  (FAC ¶¶ 97–105.)  To prevail on a defamation claim under California law, a plaintiff must prove (1) a publication that is (2) false, (3) defamatory, and (4) unprivileged, and that (5) has a natural tendency to injure or that causes special damage.[5]  *Taus v. Loftus*, 151 P.3d 1185, 1209 (Cal. 2007).  Defamation may be effected by slander or, as in this case, libel.  Cal. Civ. Code § 44.  "Libel is a false and unprivileged publication by writing . . . which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."  *Id.* § 45.

***A.      MacDonald's Standing***

In a defamation action, the First Amendment requires that the statement on which the claim is based "must specifically refer to, or be 'of and concerning,' the plaintiff in some way."  *Blatty v. N.Y. Times Co.*, 728 P.2d 1177, 1182 (Cal. 1986).  According to Defendant Robert L. FitzParick (FitzPatrick) and Minkow, none of Defendants' statements can be reasonably interpreted as referring to MacDonald.  (*See, e.g.*, Doc. No. 88-1 (Mem. ISO FitzPatrick Mot.), at 19 n.5; Minkow Reply 3–4.)

Under California law, whether a statement can be reasonably interpreted as referring to a plaintiff is a question of law for the Court.  *SDV/ACCI, Inc. v. AT&T Corp.*, 522 F.3d 955, 959 (9th

---

[4]  At oral argument on the motions, Plaintiffs' counsel contended that Plaintiffs allege both libel per se and ordinary libel claims.  The Court would urge Plaintiffs' counsel to read the first amended complaint.  Plaintiffs' first claim is captioned "Libel *Per Se*" (FAC 19); Plaintiffs contend that Defendants' statements are libelous per se because, *inter alia*, they "claim Plaintiffs engaged in criminal conduct and other violations of the law" (FAC ¶ 103.)  Accordingly, the Court's analysis of this claim is limited to whether the statements meet the test of libel per se.

[5]  Except for the element of publication, all of the elements of defamation are in dispute in this case.

Cir. 2008) (citing *Alszeh v. Home Box Office*, 80 Cal. Rptr. 2d 16, 18 (Cal. Ct. App. 1998)).   To proceed with his suit as an individual, MacDonald must show that (1) the Defendants' statements could reasonably be understood as referring to him as an individual and (2) some third party understood the statements in this way.   *Id.* (citing, *inter alia*, *Dewitt v. Wright*, 57 Cal. 576, 578 (Cal. 1881)).

MacDonald fails to satisfy both requirements.   Although Plaintiffs identify dozens of statements about Medifast and TSFL (FAC Exs. 1–31), only a few specifically refer to MacDonald or associate him with Medifast (*e.g.*, Doc. Nos. 106–14 (Cohen Decl. ISO Opp'n), at Ex. 61, at 1, 6; *id.* Ex. 117, at 5, 9; *id.* Ex. 120).   The statements that do mention MacDonald only do so in a limited context and are not defamatory.   Specifically, they (1) relate allegations that MacDonald posted messages in support of Medifast on an internet message board (Cohen Decl. ISO Opp'n Ex. 61, at 1; *id.* Ex. 117, at 5 n.5), which were widely reported (Doc. Nos. 89–95 (Grell Decl. ISO FitzPatrick Mot.), at Exs. U, V); and (2) repeat MacDonald's public statements (Cohen Decl. ISO Opp'n 117, at 5 n.4; *id.* Ex. 120).   The remainder of the statements, which do not mention MacDonald, simply cannot "reasonably be understood as referring to" MacDonald.   *SDV/ACCI*, 522 F.3d at 959.

Further, the only evidence that third parties understood the statements as referring to MacDonald consists of postings on an internet message board disparaging MacDonald.   (*See* FAC Exs. 28–29.)   Plaintiffs ask the Court to infer from the content of the postings that they are based on Defendants' statements.   (*See* Opp'n 32 ("These postings . . . are not only proof that Defendants' defamatory postings are *reasonably capable* of being understood as referring to Brad MacDonald—they were, in fact, so understood by third parties.").)   However, none of these postings link to, quote from, or reference Defendants' statements.[6]   At most, they use similar language.   (*See, e.g.*, FAC Ex. 28 ("Pimp-Daddy-Brad McDonald [sic] is a disgrace to our Armed Forces for running a Madoff Ponzi Scheme and ripping off good people.").)   To conclude that the authors of these postings read Defendants' statements and understood them as referring to MacDonald would be pure speculation.   *See Hall*, 63 Cal. Rptr. 3d at 804 (holding that plaintiff must oppose anti-SLAPP motion

---

[6] One posting—by poster "zeeyourself" on October 14, 2009—links to a report by Coenen. (FAC Ex. 29.)   However, neither this posting nor other messages in the same thread reference MacDonald.

1    with evidence that would be admissible at trial).

2        Accordingly, the Court **GRANTS** Defendants' anti-SLAPP motions as to MacDonald.[7]

3    *B.    Public Figure*

4        Because a public figure must prove by clear and convincing evidence that the allegedly

5    defamatory statement was made with "actual malice"—"that is, with knowledge that it was false or

6    with reckless disregard of whether it was false or not"—another threshold issue is whether Medifast

7    is a public figure. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964); *see also Ampex Corp. v.*

8    *Cargle*, 27 Cal. Rptr. 3d 863, 870 (Cal. Ct. App. 2005) ("In the context of an anti-SLAPP suit, courts

9    must consider the pertinent burden of proof in ascertaining whether the plaintiff has shown a

10   probability of prevailing."). Defendants contend that Medifast meets this test (Coenen Reply 9–12;

11   Doc. No. 98-1 (Mem. ISO Minkow Mot.), at 13; Mem. ISO FitzPatrick Mot. 21), but Medifast

12   disagrees (Opp'n 23–30).

13       There are two types of public figures. "All purpose" public figures "occupy positions of such

14   persuasive power and influence that they are deemed public figures for all purposes." *Gertz v. Robert*

15   *Welch, Inc.*, 418 U.S. 323, 345 (1974). In contrast, a "limited purpose" public figure has "voluntarily

16   inject[ed] himself or is drawn into a particular public controversy and thereby becomes a public figure

17   for a limited range of issues." *Id.* at 351. For the most part, those who attain public figure status

18   "have assumed roles of especial prominence in the affairs of society." *Id.* at 345.

19       Defendants do not contend that Medifast has assumed a position of such pervasive power and

20   influence that it should be deemed a public figure for all purposes. *See id.* The question, then, is

21   whether Medifast has attained limited public figure status. Three elements must be met to characterize

22   a plaintiff as a limited public figure:

23           First, there must be a public controversy, which means the issue was debated publicly
             and had foreseeable and substantial ramifications for nonparticipants. Second, the
24           plaintiff must have undertaken some voluntary act through which he or she sought to
             influence resolution of the public issue. In this regard, it is sufficient that the plaintiff
25           attempts to thrust him or herself into the public eye. And finally, the alleged
             defamation must be germane to the plaintiff's participation in the controversy.

26

27   ───────────────────

28       [7] Because the Court concludes that Defendants' anti-SLAPP motions should be granted as to
     MacDonald, the analysis of the defamation and conspiracy to defame causes of action are limited to
     Medifast.

*Ampex*, 27 Cal. Rptr. 3d at 870; *accord Makaeff v. Trump Univ., LLC*, 2010 WL 3341638, at *4 (S.D. Cal. Aug. 23, 2010) (Gonzalez, J.) (citing *Gilbert v. Sykes*, 53 Cal. Rptr. 3d 752, 762 (Cal. Ct. App. 2007)).

*(1)     Public Controversy*

Coenen contends that Medifast has "voluntarily placed itself at the core of two substantial debates: the country's obesity epidemic and the personal finance crisis."[8]  (Coenen Reply 10; *see* FitzPatrick Reply 8.)  But the Court finds that neither of these purported debates bears the necessary hallmarks of a "public controversy."

Defendants do not identify a standard for judging whether a particular public controversy exists.  The definition of "controversy" is a useful starting point: "A dispute, especially a public one, between sides holding opposing views."  THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 400 (4th ed. 2000).  Coenen's preferred nomenclature, "debate," similarly means "A discussion involving opposing sides; an argument."  *Id.* at 468.  Thus, a controversy clearly requires, at least, the presence of two sides holding conflicting views on a particular issue or set of issues.  *See Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1296 (D.C. Cir. 1980) ("A public controversy is not simply a matter of interest to the public; it must be a real dispute, the outcome of which affects the general public or some segment of it in an appreciable way.");  *Gilbert*, 53 Cal. Rptr. 3d at 762 ("A person becomes a limited public figure by injecting himself into a *public debate about a topic that concerns a substantial number of people*." (emphasis added)).

The parties' cases illustrate the point.  In *Ampex*, a public controversy existed regarding the plaintiff's "decision and action in discontinuing" a line of business, which had "elicited concerns about the management of Ampex."  27 Cal. Rptr. 3d at 870.  In *Reader's Digest*, a public controversy existed regarding The Syannon Church's reputation as an organization for the rehabilitation of drug

---

[8]  Defendant Robert FitzPatrick argues that Medifast "voluntarily injected [itself] into the *public arena* through [its] promotions, advertisements[,] and press releases."  (Mem. ISO FitzPatrick Mot. 21 (emphasis added).)  FitzPatrick thus asks the Court to read "controversy" out of the public controversy requirement.  *See generally Ampex*, 27 Cal. Rptr. 3d at 870.  The Court declines to do so. *Cf. Reader's Digest Ass'n v. Superior Court*, 690 P.2d 610, 616 (Cal. 1984) ("[W]hen called upon to make a determination of public figure status, courts should look for evidence of *affirmative actions by which purported 'public figures' have thrust themselves into the forefront of *particular public controversies*." (emphasis added)).

addicts, and various publications had weighed in on both sides of the debate. 690 P.2d at 616–17. In *Makaeff*, the court assumed without deciding that a public controversy existed "concerning Trump University's alleged deceptive business practices." 2010 WL 3341638, at *4. And in Coenen's preferred case, *Gilbert* (*see* Coenen Reply 10), the plaintiff injected himself into a public debate regarding "the relative merits of plastic surgery" by publicly "touting the virtues of cosmetic and reconstructive surgery." 53 Cal. Rptr. 3d at 762.

In contrast, the "substantial debates" Medifast has allegedly thrust itself into do not involve the presence of two sides holding conflicting views on a particular issue. America's obesity epidemic and the personal finance crisis are not controversial topics. Rather, any informed member of the public knows that each is a problem in need of a solution. *See Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 167 n.8 (1979) (concluding that no public controversy about the desirability of permitting Soviet espionage in the United States existed in 1958 because "all responsible United States citizens understandably were and are opposed to it"). Perhaps *how* to solve each problem is an issue of legitimate dispute, but Coenen does not contend that Medifast has thrust itself into those controversies.

Minkow also contends that Medifast has voluntarily injected itself into public controversies regarding the safety of its products and the viability of its business practices. (Minkow Reply 5–6.) Minkow submits that a public controversy regarding the safety of Medifast's products exists because numerous customers sued Jason Pharmaceuticals, Inc. (Jason)—Medifast's predecessor-in-interest—for personal injuries allegedly caused by the Medifast program. (*See* Grell Decl. ISO FitzPatrick Mot. Ex. H.) Jason also entered into a consent decree with the Federal Trade Commission for, *inter alia*, failing to disclose potential health risks regarding the Medifast program. (*Id.* Ex. G, at 901.) According to Minkow, "Medifast has attempted to publicly rebut this negative press regarding the safety of its products by claiming that the products are physician recommended and 'safe.'" (Minkow Reply 5.)

However, Minkow fails to establish a relationship between the personal injury lawsuits and consent decree against Jason, and Medifast's alleged rebuttals. The FTC's consent decree was entered in 1992 (Grell Decl. ISO FitzPatrick Mot. Ex. G), and the personal injury lawsuits were reported in 1993 (*id.* Ex. H). Medifast's alleged responses—which came in Securities and Exchange Commission

filings and press releases—occurred in 2001, 2003, and 2008. (*Id.* Exs. O, P, Q.) And although Minkow characterizes these documents as "attempt[s] to publicly rebut . . . negative press," they do not reference the personal injury lawsuits or consent decree. (Minkow Reply 5.) This is significant because Medifast's SEC filings discuss risk factors, including "Legal" and "Products Liability" risks, yet they omit any reference to the negative press they purportedly rebut. (*See* Grell Decl. ISO FitzPatrick Mot. Exs. P, Q.) Accordingly, the Court finds that Minkow fails to establish the existence of a controversy regarding the safety of Medifast's products.

Minkow also contends that Medifast voluntarily injected itself into a preexisting public regarding the viability of its business practices. (Minkow Reply 5 ("[O]ver a period of years the propriety and viability of Medifast's business practices have been challenged in a number of published reports and proxy solicitation materials.").) Minkow cites proxy materials regarding MacDonald's candidacy for Medifast's board of directors, and press accounts reporting (1) allegations that MacDonald posted messages in support of Medifast on an internet message board; (2) allegations that Medifast improperly relied on a study regarding medical benefits of the company's products; and (3) MacDonald's departure from Medifast's board of directors. (*See* Grell Decl. ISO FitzPatrick Mot. Exs. L, M, U, V, W.) The proxy materials are from 1997 (*id.* Exs. L, M), and the press accounts date between 2003 and 2007 (*id.* Exs. U, V, W).

The Court finds that this evidence does not establish a public controversy, extant when Defendants published their first statements, regarding Medifast's business practices. As to the proxy materials, any public controversy regarding MacDonald's candidacy for Medifast's board of directors ended, at the latest, when he stepped down from the board in 2007. (*Id.* Ex. U.) And the press accounts only establish sporadic controversies of limited scope. (*See id.* Exs. U, V, W.) They do not mention TSFL's business model, and the most recent report appeared more than two years before Defendants' first statements. Accordingly, any controversy that may have existed did not broadly encompass "the viability of Medifast's business practices," as Minkow contends, and petered out long before Defendants made the statements at issue in this case. (Minkow Reply 5.)

If any public controversy existed in February 2009, it had to do with TSFL's business model

and Medifast's allegedly deceptive business practices, and Defendants initiated it.[9]  (*See* Opp'n 26 ("The only 'controversy' at issue—and the basis of Plaintiffs' defamation claim—involves Defendants' repeated allegations that Medifast . . . is a pyramid and Ponzi scheme . . . ."); Mem. ISO Minkow Mot. 13 n.3 (arguing that Medifast injected itself into the public controversy regarding its business model).)  Even Coenen seems to recognize this, contending in her reply that Medifast voluntarily injected itself into the relevant public controversy "by publishing claims about TSFL in several press releases promoting itself, and by forecasting future success based on the continued growth of the TSFL program." (Coenen Reply 11.)  The Court assumes for the sake of argument that such a controversy exists and turns to the next element of the limited public figure inquiry.

*(2)     Voluntary Injection*

Assuming that a public controversy regarding TSFL's business model exists, the Court must determine whether Medifast undertook some voluntary act through which it sought to influence resolution of that issue. *Ampex*, 27 Cal. Rptr. 3d at 870.  Defendants contend that Medifast voluntarily injected itself into the controversy in two ways, but the Court finds neither persuasive.

First, FitzParick argues that Medifast "voluntarily injected [itself] into the public arena through [its] promotions, advertisements[,] and press releases about Medifast and Medifast's 'Trilogy of Optimal Health.'"  (Mem. ISO FitzPatrick Mot. 21; *see* Doc. Nos. 123-1 to -2 (Grell Decl. ISO FitzPatrick's Reply), at Ex. C.)  Similarly, Coenen argues that "Medifast invited public attention to itself and the TSFL program" by touting TSFL's success in periodic press releases announcing financial results.  (Coenen Reply 11 (citing Doc. Nos. 97-4 to -18 (Duvernay Decl. ISO Coenen Mot.) Exs. M, O, R, CC).)  But as Medifast argues, aggressive advertising alone does not convert a company into a public figure.  *See Makaeff*, 2010 WL 3341638, at *5 (citing *Vegod*, 603 P.2d at 17–18).  In *Vegod*, the statements at issue were made by a local television news reporter, who broadcast a story that the plaintiffs—corporations engaged in closing out stores that are going out of business—were

---

[9]  Medifast contends that California law "require[s] the existence of a public controversy *prior to the defamatory statements at issue*, before limited-purpose public figure status can be found." (Opp'n 25 (emphasis in original); *see Vegod*, 603 P.2d at 18 (holding that "a person in the business world advertising his wares does not necessarily become part of an *existing public controversy*" (emphasis added)).)  Whether or not the Court agrees with this proposition, it pertains to the second element of the limited public figure inquiry—whether the plaintiff voluntarily injected himself into the public controversy.  *See Ampex*, 27 Cal. Rptr. 3d at 870.

deceiving the public in conducting a closeout sale and promising bargains that were not really bargains

at all.  603 P.2d at 15.  The California Supreme Court held that the plaintiffs were not public figures

and therefore were not required to prove actual malice to prevail on their defamation claim:

> Criticism of commercial conduct does not deserve the special protection of the actual malice test.  Balancing one individual's limited First Amendment interest against another's reputation interest, we conclude that a person in the business world advertising his wares does not necessarily become part of an existing public controversy.  It follows those assuming the role of business practice critic do not acquire the First Amendment privilege to denigrate such entrepreneur.

*Id.* at 18.

Coenen's attempts to distinguish *Vegod* and *Makaeff* are unpersuasive.  (Coenen Reply 11 &

n.12.)  A corporation is not voluntarily injected into a public controversy when others publicly refute

claims made by the corporation's advertising.  (*See id.* at 11.)  Nor are the holdings in *Vegod* and

*Makaeff* dependent on the plaintiff's position.  (*See id.* at 11 n.12.)  Accordingly, the Court finds that

Medifast is not a public figure by virtue of its advertising.

Second, Minkow argues that Medifast injected itself into the controversy regarding TSFL's

business model "by publicly rebutting [Defendants'] criticisms with multiple press releases of its own,

establishing a special committee for the purpose of considering FitzPatrick's findings[,] and then suing

[D]efendants over their comments."  (Mem. ISO Minkow Mot. 13 n.3.)  But as Medifast argues, "a

plaintiff does not become a public figure simply by responding to defamatory statements."  *Mosesian

v. McClatchy Newspapers*, 285 Cal. Rptr. 430, 440 (Cal. Ct. App. 1991) (citing *Time, Inc. v.

Firestone*, 424 U.S. 448, 454 n.3 (1976)).  "Under the common law, the publication of a defamatory

attack constitutes an 'occasion' triggering the conditional privilege of reply, but the privilege is lost

if it is 'abused.'"  *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1559 (4th Cir. 1994).

Accordingly, Medifast could respond to Defendants' statements without becoming limited figures, so

long as they did so relevantly, proportionately, and narrowly.  *Id.* at 1560.  Defendants' argument that

Medifast became a public figure by exercising this privilege lacks merit.

Accordingly, the Court finds that Medifast is not a limited public figure.  Because Medifast

is not a public figure, it need not prove actual malice to prevail on its defamation claim.

## C.    *Defendants' Statements*

"Under California law, recovery for defamation may be had only for false statements of fact.

- 12 -

Statements of opinion are not actionable." *Info. Control Corp. v. Genesis One Computer Corp.*, 611 F.2d 781, 783 (9th Cir. 1980). "The critical determination of whether the allegedly defamatory statement constitutes fact or opinion is a question of law." *Gregory v. McDonnell Douglas Corp.*, 552 P.2d 425, 428 (Cal. 1976). The determination is context-specific, so "the court must place itself in the position of the hearer or reader, and determine the sense or meaning of the statement according to its natural and popular construction." *Baker v. L.A. Herald Examiner*, 721 P.2d 87, 90 (Cal. 1986). "The key is not parsing whether a published statement is fact or opinion, but 'whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact.'" *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 61 Cal. Rptr. 3d 29, 39 (Cal. Ct. App. 2007) (quoting *Franklin v. Dynamic Details, Inc.*, 10 Cal. Rptr. 3d 429, 436 (Cal. Ct. App. 2004)).

If a statement is libelous per se, "damage to plaintiff's reputation is conclusively presumed and he need not introduce any evidence of actual damages in order to obtain or sustain an award of damages." *Barnes-Hind, Inc. v. Superior Court*, 226 Cal. Rptr. 354, 356 (Cal. Ct. App. 1986) (quoting *Contento v. Mitchell*, 104 Cal. Rptr. 591, 592 (Cal. Ct. App. 1972)). Defamatory language is libelous per se if it is "defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact." Cal. Civ. Code § 45a. "Perhaps the clearest example of libel per se is an accusation of crime." *Barnes-Hind*, 226 Cal. Rptr. at 358. However, "it is not necessary that the publication charge the commission of a crime; it is sufficient if it so reflect's on the person's integrity as to bring him or her into disrepute." 5 B.E. WITKIN, SUMMARY OF CALIFORNIA LAW, TORTS § 543 (10th ed. 2005).

Medifast alleges a libel per se claim (FAC ¶¶ 97–105), predicated on Defendants' alleged statements accusing Medifast of "running a Madoff-sized Ponzi scheme, violating federal securities laws and defrauding its investors, running an illegal pyramid scheme in violation of a California criminal statute, poisoning its health coaches for profit, and using the services of a Madoff-like accounting firm to cover up their illegal activities" (Opp'n 33).

If Defendants' statements were as explicit as Medifast makes them out to be, the Court's job would be easy. *See generally Makaeff*, 2010 WL 3341638, at *5–7 (denying anti-SLAPP motion where defendant accused plaintiff of crimes including "grand larceny" and "identity theft").

Problematically though, Medifast does not plead the exact words constituting the alleged defamation. *See Chatsakis v. Mark Burnett Prods.*, 2009 WL 1248947, at *4 (C.D. Cal. Apr. 27, 2009). Rather, as Minkow argues, Medifast paraphrases Defendants' statements in its pleadings, seemingly for maximum shock value. (Minkow Reply 1.) Of the thirty-seven allegedly false statements identified in Medifast's opposition—which Medifast calls "the more egregious statements made by each Defendant" (Opp'n 41)—most regard the structure and function of TSFL's compensation system. (*See id.* 41–44.) These statements do not charge Medifast with commission of a crime, nor are they otherwise defamatory without the necessity of explanatory matter; accordingly, they cannot support Medifast's claim for libel per se. Cal. Civ. Code § 45a.

Nevertheless, three categories of statements merit closer scrutiny, and the Court addresses them below.

*(1)      Defendant FitzPatrick's Endless Chain Accusations*

In his report dated February 16, 2009, FitzPatrick concludes "that TSFL's business model and reward system—by their design, operation[,] and promotion—meet the definition of an 'endless chain' within the meaning of" Penal Code section 327. (Cohen Decl. ISO Opp'n Ex. 61, at 8.)[10]  In the context of FitzPatrick's "Expert Report," a reasonable fact finder could conclude that these statements declare or imply a provably false statement of fact, to wit, that TSFL's business model and reward system are an endless chain in violation of Penal Code section 327.[11]  *See Overstock.com*, 61 Cal. Rptr. 3d 39, 43–44 (holding that research reports constituted actionable statements of fact because defendants held them out as "prepared by certified public accountants and financial analysts," and "[t]he tone and content [was] serious"). They are also libelous per se because they accuse Medifast of a crime. *Barnes-Hind*, 226 Cal. Rptr. at 358

---

[10] *See also* Cohen Decl. ISO Opp'n at 12–15 (discussing "Medifast and the California 'Endless Chain' Statute"); *id.* at 19 ("Medifast is hinging its business upon the 'endless chain' incentive to induce people to work for it."); *id.* at 27 ("Using an endless chain lure to solicit consumers places the entire Medifast program in jeopardy of violating California's and other state's [sic] laws against endless chains, pyramid schemes[,] and deceptive trade practices, in my view.").

[11] That these statements are couched in language like "in my view" does not affect the Court's analysis. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990); *Overstock.com*, 61 Cal. Rptr. 3d, at 703–04 ("[S]tatements in the publications do not attain constitutional protection simply because they are sprinkled with words to the effect that something does or does not 'appear' to be thus and so; or because they are framed as being 'in our opinion' or as a matter of 'concern.'").

Further, Medifast makes a prima facie showing that the statements are false.  Under Penal Code section 327:

> [A]n "endless chain" means any scheme for the disposal or distribution of property whereby a participant pays a valuable consideration for the chance to receive compensation for introducing one or more additional persons into participation in the scheme or for the chance to receive compensation when a person introduced by the participant introduces a new participant.

"A pyramid sales plan under which the compensation for recruitment is limited to 'payment based upon sales made to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme,' does not come within the definition of endless chain schemes set forth in Penal Code section 327." *People v. Bestline Prods., Inc.*, 132 Cal. Rptr. 767, 789 (Cal. Ct. App. 1976).

Medifast submits the declaration of TSFL board member Daniel Bell (Doc. No. 105-1 (Bell Decl.) ¶ 6), who is "the architect of the TSFL compensation plan" (*id.* ¶ 44).  Bell unequivocally states that, under TSFL's compensation plan, "no compensation of any kind is paid merely for 'recruiting' or sponsoring another health coach. . . . Indeed, the only time a sponsor or business coach is paid is if his or her sponsored health coach obtains new clients who make actual purchases of Medifast products." (*Id.* ¶ 38.)  Health coaches at all levels only receive bonuses if they reach certain retail sales targets; bonuses are not paid for simply "introducing one or more additional persons into participation in" TSFL, Cal. Penal Code § 327.  (Bell Decl. ¶¶ 59–67.)  Further, the vast majority of orders of Medifast products—sales on which commissions are paid—are placed by clients (as opposed to health coaches) who are not participants in the scheme.  (*Id.* ¶¶ 35, 56.)

FitzPatrick does not present any evidence to rebut the Bell's declaration, other than declarations restating the allegations in his report.  (*See, e.g.*, Doc. No. 88-3 (First FitzPatrick Aff.) ¶ 94; Doc. No. 123-3 (Third FitzPatrick Aff.) ¶¶ 41–56.)  These declarations are insufficient to rebut Medifast's prima facie showing of falsity.[12]

//

---

[12] Tellingly, an attorney that FitzPatrick and Defendant Minkow solicited to write an opinion letter to "bolster the charge that Medifast is in violation of" Penal Code section 327 (Cohen Decl. ISO Opp'n Ex. 51) was "less than enthusiastic" about the project (*id.* Ex. 56).  (*See generally id.* Exs. 51–55.)

(a)      Civil Code section 47(b)

FitzPatrick contends that his statements are privileged under Civil Code section 47(b)[13] because his report requested that the California Attorney General and FTC take legal action against Medifast. (Mem. ISO FitzPatrick Mot. 6; FitzPatrick Reply 5–7.) "Section 47(b) protects false or fraudulent statements or representations made in the course of litigation or in contemplation of litigation . . . ." *Fenters v. Yosemite Chevron*, 2006 WL 3762116, at *11 (E.D. Cal. Dec. 20, 2006) (citations omitted). If FitzPatrick had only sent his report to the Attorney General and the FTC, he might be entitled to section 47(b)'s protection. *See Hagberg v. Cal. Fed. Bank FSB*, 81 P.3d 244, 249 (Cal. 2004) ("[M]any cases have held that the official proceeding privilege applies to a communication intended to prompt an administrative agency charged with enforcing the law to investigate or remedy a wrongdoing."); *Kashian v. Harriman*, 120 Cal. Rptr. 2d 576 (Cal. Ct. App. 2002) (holding that delivery of letter to Attorney General urging investigation of organization's tax exempt status was absolutely privileged). Similarly, the privilege would protect FitzPatrick's statements if they were limited to "communications between private parties regarding whether the parties should urge the Attorney General to investigate suspected wrongdoing." (FitzPatrick's Reply 6; *see Hagberg*, 81 P.3d at 250 (citing *Dove Audio, Inc. v. Rosenfeld, Meyer & Susman*, 54 Cal. Rptr. 2d 830, 782–83 (Cal. Ct. App. 1996) (holding that "communications preliminary to the institution of an official proceeding come within the privilege of" section 47(b))).

FitzPatrick went a step further, however. In addition to sending his report to Defendant Minkow (Cohen Decl. ISO Opp'n Ex. 56) and allegedly forwarding it to the Attorney General (*see* Doc. No. 89-1 (Second FitzPatrick Aff.) ¶ 7),[14] he sent the report to Minkow for publication on the

---

[13] In relevant part, section 47(b) provides: "A privileged broadcast is one made: . . . (b) In any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) in the initiation or course of any other proceeding authorized by law . . . ." Cal. Civ. Code § 47(b).

[14] The evidence on this point is contradictory. At his deposition, FitzPatrick testified that he did not "directly" provide a copy of his report to the Attorney General. (Cohen Decl. ISO Opp'n Ex. 3, at 275.) However, in a later affidavit, FitzPatrick stated that he "followed [his] usual approach and notified the authorities" regarding his Medifast findings. (Second FitzPatrick Aff. ¶ 7; *see also* Mem. ISO FitzPatrick Mot. 6 ("FitzPatrick's reports were also sent to the California Attorney General and the FTC . . . ."); FitzPatrick Reply 7 (noting that FitzPatrick's "custom and practice" was to "send all of the reports he did on companies to the AG, SEC[,] or the FTC in hopes that they would take

- 16 -                                                                                          10cv382

"Medifraud.net" website (Cohen Decl. ISO Opp'n Ex. 56) and  published it on his own "Pyramid Scheme Alert" website (*id.* Ex. 72; First FitzPatrick Aff. ¶ 4).  Civil Code section 47(b) does not protect this final step because litigation privilege does not extend to the broad dissemination of defamatory statements.  *See Rothman v. Jackson*, 57 Cal. Rptr. 2d 284, 294 (Cal. Ct. App. 1996).  To hold otherwise would immunize any false public accusation of wrongdoing, so long as the speaker forwards a copy of the statement to the responsible authorities.

Accordingly, the Court finds that FitzPatrick's statements are not privileged under Civil Code section 47(b).

(b)    Statute of Limitations

FitzPatrick also contends that Medifast's libel claim based on FitzPatrick's February 16, 2009 is barred by the applicable one-year statute of limitations.  (Mem. ISO FitzPatrick Mot. 8; *see* Cal. Civ. Proc. Code § 340(c).)  "[A] cause of action for defamation accrues at the time the defamatory statement is 'published,' (using the term 'published' in its technical sense)."  *Shively v. Bozanich*, 80 P.3d 676, 686 (Cal. 2003).  "[T]he repetition by a new party of another person's earlier defamatory remark . . . gives rise to a separate cause of action against the *original defamer*, when the repetition is reasonably foreseeable."  *Id.* at 683 (emphasis in original).

Here, although FitzPatrick's report was dated February 16, 2009, it was republished the next day, February 17, 2009, on the "Medifraud.net" website.  (Cohen Decl. ISO Opp'n Ex. 59.)  This republication by Defendants Minkow and FDI was reasonably foreseeable—FitzPatrick sent his updated report to Defendant Minkow for the express purpose of "getting the report out there."  (*Id.* Ex. 56; *see id.* Ex. 3, at 114 (FitzPatrick, testifying that he allowed his reports to be published on the FDI website).)  Thus, a new claim by Medifast against FitzPatrick accrued on February 17, 2009, and Medifast timely filed its complaint on February 17, 2010.

FitzPatrick submits that Medifast ignores the single publication rule, "which states the statute [of limitations] commences to run on the first publication to a single person."  (FitzPatrick Reply 15.)  However, the single publication rule "does not address the issue of repeated publications of the same

_____

action").)  For the purpose of this motion, the Court assumes for the sake of argument that FitzPatrick sent his report to the Attorney General.

1   libelous matter over a substantial period of time." *Christoff v. Nestle USA, Inc.*, 213 P.3d 132, 140

2   (Cal. 2009).  Rather, the single publication rule applies where the same aggregate communication is

3   heard at the same time by two or more persons. *Id.*; *see also Shively*, 80 P.3d at 686 (noting that single

4   publication rules applies "with respect to books and newspapers").  The single publication rule clearly

5   does not apply to FitzPatrick's initial publication of the report, which was only addressed to Defendant

6   Minkow. (*See* Cohen Decl. ISO Opp'n Ex. 56.)  Accordingly, a new claim against FitzPatrick accrued

7   on February 17, 2009, when Defendants Minkow and FDI foreseeably republished the report. *Shively*,

8   80 P.3d at 683.

9        Accordingly, Defendant FitzPatrick's motion is **DENIED** as to Medifast's libel per se claim.[15]

10  *(2)   Madoff Comparisons*

11       According to Medifast, "[t]he most flagrant of [Defendants'] false assertions is that Medifast,

12  like Bernie Madoff[,] is running a Ponzi scheme—an illegal criminal enterprise called Take Shape For

13  Life." (Opp'n 34.)  By way of example, Defendants (1) compared TSFL's compensation plan to

14  "Madoff's secret trading system" (Cohen Decl. ISO Opp'n Ex. 61, at 7); (2) published a document

15  purporting to expose "points of similarity between Madoff and Medifast" (*id.* Ex. 62); (3) published

16  a document noting that both Madoff and Medifast employed small accounting firms (*id.* Ex. 107); and

17  (4) used Madoff as an example when discussing Medifast (*id.* Ex. 66).

18       Medifast's allegations suffer from a fatal flaw: Defendants' statements cannot reasonably be

19  understood as implying the provably false assertion of fact Medifast claims they imply, namely, that

20  Medifast is running a Ponzi scheme.  If Defendants had said, "Medifast, like Bernie Madoff, is

21  running a Ponzi scheme," one could scarcely dispute that Defendants would be liable for defamation.

22  *See, e.g.*, *Makaeff*, 2010 WL 3341638, at *5–7.  Similarly if Defendants had said, "Medifast runs its

23  business like Bernie Madoff."  But Defendants' actual statements were not nearly so explicit.

24       Contrary to Medifast's apparent contention, Defendants did not accuse Medifast of running

25  a Ponzi scheme by simply using "Medifast" and "Madoff" in the same breath.  Rather, the context of

26  _____

27       [15]  Because Medifast has shown a probability of prevailing on its libel per se claim regarding
    the statement that TSFL is an endless chain in violation of Penal Code section 327, the entire libel per
28  se claim against FitzPatrick stands.  *See Makaeff*, 2010 WL 3341638, at *5 n.4 (quoting *Mann v.
    Quality Old Time Serv., Inc.*, 15 Cal. Rptr. 3d 215, 223 (Cal. Ct. App. 2004).

Defendants' statements shows that they used Madoff as a contemporary cautionary tale. (*See, e.g.*, Cohen Decl. ISO Opp'n Ex. 61, at 7 ("Like . . . Madoff's secret trading system, Medifast dazzles its prospects with the classic and indecipherable MLM pay plan, showing the potential of an income with 'no cap.'").)   If any statement of fact can be implied from Defendants' statements, it is this: Things at Medifast are not what they seem.  Such a statement is too inexact or subjective to support a libel per se claim; no reasonable person could construe it to be provably false.

Viewing Defendants' statements in their context, no reasonable factfinder could conclude that Defendants accused Medifast of running a Ponzi scheme.  Accordingly, Minkow's and Coenen's motions are **GRANTED** as to these statements.

*(3)     Auditor Conflict Allegations*

Medifast also alleges that Defendants accused Medifast of "committing securities fraud, and using their one-office auditing firm to cover up the fraud—their one-office accounting firm that was illegally pumping MED stock to their clients." (Opp'n 37.)  In a press release, Defendants Minkow and FDI accused BJL Wealth Management, LLC (BJL)—an affiliate of Medifast's outside auditor—of "recommend[ing] the purchase of Medifast stock to an operative of the Fraud Discovery Institute, Inc." (Cohen Decl. ISO Opp'n Ex. 106.)  Defendant Minkow opined:

> This is a disturbing finding and one that seems to pass the test of "the appearance of impropriety."  In a post Enron/Sarbanes-Oxley environment, for an independent, outside  auditor that is in this case the corroborator of Medifast's recent blow-out earnings—which has subsequently induced massive public investment thus dramatically increasing Medifast's stock price—to apparently have stake in the game is troubling.

(*Id.*) Similarly, in a post on the Fraud Files blog maintained by the Defendants Coenen and Sequence, Inc., Coenen cited Minkow and FDI's press release and opined:

> [Medifast] is audited by Bagell, Josephs, Levine & Company.  The audit partner happens to also be a part of BJL Weath Management, an investment firm with the same address as the audit firm.
>
> This becomes interesting when you consider that BJL Wealth Management recommended the purchase of Medifast stock to an operative of FDI.  Is this a conflict of interest? It may be.  Does the audit partner, in his role at the investment firm, make recommendations regarding Medifast stock?  Does he have any financial interest in transactions involving Medifast stock? If the answer to either of these questions is yes, then the audit partner would have compromised his independence.

(*Id.* Ex. 111.)

- 19 -

10cv382

Medifast makes a prima facie showing that the initial statement—that BJL recommended the purchase of Medifast stock to an FDI operative—is false. Medifast submits the affidavits of three BJL employees, all of whom unequivocally state that they never recommended the purchase of Medifast stock to "Mike," FDI's operative. (Doc. Nos. 105-2 (Hollander Aff.) ¶ 5; 105-3 (Bagell Aff.) ¶ 13; 105-4 (Holmes Aff. ¶ 9.) That this statement is false, however, is not dispositive; the allegation that Medifast's outside auditor recommended the purchase of Medifast stock is not defamatory without the necessity of explanatory matter. *See* Cal. Civ. Code § 45a.

As to the remainder of Defendants Minkow and Coenen's statements, the Court finds that they do not imply that Medifast committed securities fraud by colluding with its accounting firm to "illegally pump[] MED stock." (Opp'n 37.) In context, Coenen's statement only expresses her opinion that the audit partner *might* have a conflict of interest—an opinion that is dependent on the existence of additional facts. (*See* Cohen Decl. ISO Opp'n Ex. 111.) Similarly, Minkow's statement expresses his opinion that a conflict of interest—albeit a conflict of interest based on a false premise—would be "troubling." (*Id.* Ex. 106.)

No reasonable factfinder could conclude that Defendants Minkow and Coenen accused Medifast of committing securities fraud through collusion with its accounting firm. Accordingly, Minkow's and Coenen's motions are **GRANTED** as to these statements.

*(4)   Remaining Statements*

As stated above, the remaining allegedly false statements generally regard the structure and function of TSFL's compensation system. (*See* Opp'n 41–44.) Even assuming their factual character and falsity, these statements cannot support Medifast's libel per se claim because they are not defamatory without the necessity of explanatory matter. *See* Cal. Civ. Code § 45a. Accordingly, Minkow's and Coenen's motions are **GRANTED** as to the remaining statements.

**2.   Civil Conspiracy to Defame**

Medifast's second claim alleges a civil conspiracy to defame. (FAC ¶¶ 106–112.) "The elements of an action for civil conspiracy are [1] the formation and operation of the conspiracy and [2] damage resulting to plaintiff from [3] an act or acts done in furtherance of the common design." *Doctors' Co. v. Superior Court*, 775 P.2d 508, 510 (Cal. 1989) (quoting *Mox, Inc. v. Woods*, 262 P.

302, 303 (Cal. 1927)); *accord Fibreboard Corp. v. Hartford Accident & Indem. Co.*, 20 Cal. Rptr. 2d 376, 387 (Cal. Ct. App. 1993) ("A 'civil conspiracy' entails formation and operation of the conspiracy and acts done in furtherance of the common design."). "In order to establish liability based on conspiracy, the plaintiff must show the defendant and at least one other concurred in the tortious scheme with knowledge of its unlawful purposes." *Wilcox v. Superior Court*, 33 Cal. Rptr. 2d 446, 457–58 (Cal. Ct. App. 1994), *disapproved of on other grounds in Equilon Enters. v. Consumer Cause, Inc.*, 52 P.3d 685, 694 n.5 (Cal. 2002); *accord Strotek Corp. v. Air Transp. Ass'n of Am.*, 45 F. App'x 663, 665 (9th Cir. 2002) (affirming dismissal of civil conspiracy to defame claim because "there was no agreement to do anything unlawful, and none with respect to making defamatory statements").

Here, Medifast presents no evidence of an agreement between FitzPatrick and any other person to injure Medifast in its reputation—necessarily, the "unlawful purpose" of a conspiracy to defame. *See Wilcox*, 33 Cal. Rptr. 2d at 458. Even taking as true Medifast's allegation that Defendant Minkow's purpose in the scheme was to damage Medifast's reputation, thereby driving down Medifast's stock price and increasing the value of his short position, Coenen and FitzPatrick—by Medifast's admission—"each joined 'to further their own purposes.'" (Opp'n 51.) FitzPatrick agreed to draft his report for compensation in his role as a "recognized expert in the field of multi-level marketing and pyramid schemes." (First FitzPatrick Aff. ¶ 4; *see id.* 19–21.) Similarly, Coenen agreed to investigate Medifast in her role as a critic of multilevel marketing programs. (Doc. No. 97-2 (Coenen Decl.) ¶¶ 5, 11, 20.) Neither FitzPatrick nor Coenen ever traded Medifast stock. (First FitzPatrick Aff. ¶ 3; Coenen Decl. ¶ 23.) Although FitzPatrick and Coenen clearly had preconceived notions regarding Medifast and the propriety of TSFL's business model, there is no evidence that either agreed to participate in the investigation with a purpose to injure Medifast in its reputation.

Accordingly, Defendants' anti-SLAPP motions are **GRANTED** as to Medifast's civil conspiracy to defame claim.

### 3.    Market Manipulation

Plaintiffs' third claim alleges market manipulation in violation of Corporations Code section 25400. (FAC ¶¶ 113–18.) This statute "provides that it is unlawful in this state to make false statements or engage in specified fraudulent transactions which affect the market for a security when

done for the purpose of inducing purchase or sale of the security or raising or depressing the price of the security.  In short, it prohibits market manipulation." *Diamond Multimedia Sys., Inc. v. Superior Court*, 968 P.2d 539, 541 (Cal. 1999).  A related provision creates a civil remedy for purchasers or sellers of securities harmed by the forms of market manipulation banned by section 25400.  Cal. Corp. Code § 25500.

Plaintiffs fail to demonstrate a likelihood of success on this claim because they do not allege that they are purchasers or sellers of securities harmed by Defendants' alleged market manipulation.  *See* Cal. Corp. Code § 25500; *Overstock.com*, 61 Cal. Rptr. 3d at 717–18 (sustaining Corporations Code section 25400 claim by "former owners of Overstock common stock").  According to Plaintiffs, "Though not expressly averred, both Medifast, and MacDonald personally, executed stock purchases and sales throughout the relevant time frame, which were adversely affected by Defendants' misconduct."  (Doc. No. 118 (Opp'n to Minkow MTD), at 7.)  Plaintiffs further contend that this ancillary fact is "implicit in the allegation that Plaintiffs were damaged based upon violations of" Corporations Code section 25400.  (*Id.*)

Even assuming, *arguendo*, that Plaintiffs are correct, they ignore the well settled rule that a plaintiff opposing an anti-SLAPP motion must come forward with admissible evidence to demonstrate a likelihood of success on its claim.  *Hall*, 63 Cal. Rptr. 3d at 804.  "The plaintiff may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence." *Paiva v. Nichols*, 85 Cal. Rptr. 3d 838, 847 (Cal. Ct. App. 2008).  Here, Plaintiffs submit no evidence that they purchased or sold securities during the relevant time period and were affected by Defendants' alleged market manipulation.  Thus, they fail to make a "sufficient prima facie showing of facts to sustain a favorable judgment" on their market manipulation claim.  *Wilson v. Partker, Covert & Chidester*, 50 P.3d 733, 739 (Cal. 2002).

Accordingly, Defendants' anti-SLAPP motions are **GRANTED** as to Plaintiffs' market manipulation claim.[16]

---

[16]  Plaintiffs submit that the Court should grant leave to amend to remedy this "easily curable defect."  (Opp'n 52 n.98.)  However, it is well settled that Plaintiffs "cannot escape the anti-SLAPP procedures simply by amending [their] complaint." *Schaeffer v. City & Cnty. of S.F.*, 85 Cal. Rptr. 3d 880, 890 (Cal. Ct. App. 2008); *accord Simmons v. Allstate Ins. Co.*, 112 Cal. Rptr. 2d 397, 400-01 (Cal. Ct. App. 2001).

**5.      Unfair Business Practice**

Plaintiffs' fourth claim (UCL claim) alleges an unfair business practice in violation of Business and Professions Code section 17200.  (FAC ¶¶ 119–24.)  This claim is derivative of Plaintiffs' market manipulation and defamation claims.  (*Id.* ¶¶ 120–22.)   As the Court concluded *supra*, Plaintiffs' market manipulation claim fails for lack of evidence, and Medifast's defamation claim survives only as to FitzPatrick's accusation that Medifast violates Penal Code section 327.   Accordingly, the Court must determine whether FitzPatrick's statements can support Plaintiffs' UCL claim.

"California's unfair competition statute prohibits any unfair competition, which means 'any unlawful, unfair[,] or fraudulent business act or practice.'"  *In re Pomona Valley Med. Group, Inc.*, 476 F.3d 665, 674 (9th Cir. 2007).  To state a claim, the plaintiff must allege that the defendant's acts were unlawful, unfair, or fraudulent.  *Id.*  Competition, however, is not an element of a claim under the unfair competition statute; "the term 'embrac[es] *anything* that can properly be called a'" business act or practice.  *In re Pomona Valley Med. Group*, 476 F.3d at 675 (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 540 (Cal. 1999)).

Plaintiffs rely exclusively on *Overstock.com* in support of their UCL claim.  There, defendant Gradient Analytics (Gradient) published defamatory reports regarding accounting practices at plaintiff Overstock, an online closeout retailer.  61 Cal. Rptr. 3d at 34–36, 39–49.  Defendant Rocker Partners (Rocker), which had a short position in Overstock, helped Gradient write the reports.  *Id.* at 36. Specifically, Rocker "suggested changes [to the reports], including underscoring negative aspects, sometimes adding additional negative facts or suggesting a more negative perspective than was reflected in the drafts."  *Id.*  And at Rocker's request, "Gradient wrote several reports on Overstock that gave the company a grade of 'D' or 'F.'"  *Id.*

The California Court of Appeal concluded that Overstock stated a claim for violation of Business and Professions Code section 17200 based on Gradient's failure to disclose Rocker's participation in preparing the reports.  Specifically:

> Overstock submitted evidence that, unbeknownst to Gradient subscribers, Rocker colluded with Gradient in preparing the negative, defamatory reports about Overstock and Gradient falsely held itself out as publishing unbiased and objective reports. Unquestionably a reasonable implication of this evidence is that Gradient subscribers would likely be deceived by the nondisclosure and falsehood.

*Id.* at 50.

*Overstock.com* is inapposite. Plaintiffs have submitted no evidence that Minkow or any other Defendant collaborated with FitzPatrick in developing his report. Rather, the evidence suggests that Minkow did not see the report until it was finished. (*See* Cohen Decl. ISO Opp'n Ex. 56.) Nor is there any evidence that FitzPatrick held himself out as publishing unbiased and objective reports. Anyone remotely familiar with FitzPatrick's work would know of his strongly negative opinion of multi-level marketing strategies, whether legal or illegal. (*See id.* Ex. 3, at 18–23, 52–53, 120, 123–24, 130, 132.) Thus, Plaintiffs fail to establish that FitzPatrick's report was likely to deceive a reasonable consumer. *See Overstock.com*, 61 Cal. Rptr. 3d at 50.

Accepting Plaintiffs' argument would convert every instance of defamation for profit into a violation of Business and Professions Code section 17200. Absent a clear statement from a California court on the subject, the Court declines to reach such a sweeping conclusion. Accordingly, Defendants' anti-SLAPP motions are **GRANTED** as to Plaintiffs' UCL claim.

**CONCLUSION**

For the reasons stated above, Minkow's and Coenen's anti-SLAPP motions are **GRANTED** in their entirety. FitzPatrick's motion is (1) **GRANTED** as to MacDonald's libel per se cause of action; (2) **DENIED** as to Medifast's libel per se cause of action; (3) **GRANTED** as to Plaintiffs' civil conspiracy to defame claim; (4) **GRANTED** as to Plaintiffs' market manipulation claim; and (5) **GRANTED** as to Plaintiffs' UCL claim. Minkow's motion to dismiss, which is styled as an alternative to his anti-SLAPP motion (*see* Doc. No. 43-1, at 1), is **DENIED AS MOOT**.

**IT IS SO ORDERED.**


DATED: March 29, 2011

_____
Honorable Janis L. Sammartino
United States District Judge